STATE OF VERMONT

ENVIRONMENTAL COURT

| | |
|---|---|
| Secretary,<br> Vermont Agency of Natural Resources,<br>        Plaintiff,<br><br>        v.<br><br>Stephen Blood,<br>        d/b/a Three Mountain Lodge Restaurant,<br>        Respondent. | Docket No. 190-8-08 Vtec |

Decision and Order

On August 20, 2008, the Secretary of the Vermont Agency of Natural Resources (ANR) issued an Administrative Order pursuant to 10 V.S.A. § 8008 regarding Stephen Blood, d/b/a Three Mountain Lodge Restaurant, as Respondent.[1]  The Administrative Order cited several violations involving Respondent's failure to conduct water quality monitoring and testing at the Three Mountain Lodge Restaurant.  Respondent Stephen Blood represents himself; the Secretary of the Agency of Natural Resources is represented by John Zaikowski, Esq.

The Court extended the time for the hearing on the Administrative Order for good cause, at the request of and by agreement of the parties, to accommodate Respondent's medical issues and the parties' schedules, and while Respondent came into compliance with the one remaining remedial requirement of the Administrative

---

[1]  On January 27, 2008, the ANR had issued an Administrative Order naming only Three Mountain Lodge as respondent.  Litigation seeking enforcement of that order resulted in the ANR's withdrawal of the January 2008 Administrative Order, see Docket No. 85-5-08 Vtec, and the subsequent issuance of the Administrative Order at issue in the present case.

Order. The Court also extended the time for the issuance of the decision for good cause. No environmental harm resulted from any delay, as Respondent had come into compliance with the remedial requirements of the Administrative Order and all that remained for trial was the amount of an appropriate monetary penalty.

The statutes, rules, and permits applicable to this matter are 4 V.S.A. ch. 27 (Environmental Court); 10 V.S.A. ch. 48 (Groundwater Protection); 10 V.S.A. ch. 56 (Public Water Supply); 10 V.S.A. ch. 201 (Administrative Environmental Law Enforcement); and the following sections of the Vermont Water Supply Rules (VWSR)[2] and related federal regulations: VWSR Subchapter 21-6, § 6.6 and 40 C.F.R. § 141.21 (water quality monitoring for coliform bacteria); VWSR Subchapter 21-6, § 6.8 and 40 C.F.R. § 141.23 (water quality monitoring for nitrate); VWSR Subchapter 21-10, § 10.1 and 40 C.F.R. § 141, Subpart Q (public notice); and VWSR Subchapter 21-6, § 6.2.3 (microscopic particulate analysis for Ground Water Under the Direct Influence of Surface Water determination). See 10 V.S.A. § 8012(c)(2) (requiring the Court's decision regarding an administrative order to include an "identification of the applicable statute, rule, permit, assurance or order").

Findings

Respondent owns the Three Mountain Lodge Restaurant (the Restaurant) in Jeffersonville, Vermont, and had been operating it for 26 years as of the date of trial. At least since the issuance of the Administrative Order in August of 2008, Respondent had been experiencing some serious medical symptoms that, from time to time, made him exhausted and reduced his stamina for addressing the normal stresses of running a restaurant business.

---

[2] Vermont Water Supply Rules (2005), available at http://www.vermontdrinking water.org/wsrule/Vermont%20WSR%20April%202005.pdf.

The Restaurant operates year round except for the month of November and the month from mid-April to mid-May. The hours of operation for the Restaurant are from 4:00 p.m. to 9:00 p.m. daily. The Restaurant contributes to the economy; some of the employees of the Restaurant have worked there as long as ten or twenty years, and Respondent is current with his taxes. However, the state of the economy was such during the year from August of 2008 to August of 2009 that Respondent testified that he has "drained his bank account" in order to continue operating.

The Restaurant, which is licensed for occupancy of eighty people, serves a transient population. The water source for the Restaurant is a drilled well, which provides drinking water to more than twenty-five people per day during its operating season. Therefore, the Restaurant water system is a public water system that is classified as a "transient non-community water system" under the Vermont Water Supply statute and rules, as it serves at least twenty-five individuals daily on at least sixty days of the year, but is not used by year-round residents or by the same twenty-five or more individuals for more than six months per year. See 10 V.S.A. § 1671; VWSR § 21-2 (Public Water System).

The Water Supply Division of the ANR (Water Supply Division) is responsible for administering the Vermont Water Supply statute and rules that are applicable to the Restaurant's transient non-community water system.[3] All transient non-community water systems are required to perform certain monitoring of their water, including for total coliform bacteria and for nitrate. Monitoring consists of collecting a water sample according to a prescribed method, having the sample analyzed by a qualified laboratory, and reporting the results to the Water Supply Division. Transient non-

---

[3] The Vermont Department of Health is responsible for sanitary inspections of food and lodging establishments, which may also include the sampling and testing of the establishment's water supply by the sanitarian.

community water systems must monitor for total coliform on a quarterly basis, and for nitrate on an annual basis, in each quarter during which the system is serving water to the public. As the Restaurant is open for operation during all four quarters annually, Respondent is required to test for total coliform and report those results during all four quarterly reporting periods. Respondent is required to test for nitrate and report on an annual basis.

The presence of coliform bacteria in drinking water is of concern because they are an indicator of the presence of harmful organisms that could cause disease, and may indicate a problem with the water supply's treatment system or distribution lines. The presence of particular strains of coliform bacteria (E. coli) indicate that the water may be contaminated with human or animal wastes. Infants, the elderly, and people with compromised immune systems may particularly be at risk from contaminated water. If a water system is contaminated with coliform, those responsible for the water system are required to inform its users that the water must be boiled for at least five minutes before being used for drinking, for the washing of fruits and vegetables to be eaten raw, and for tooth brushing; bottled water must also be made available.

The presence of elevated nitrate levels in drinking water is a particularly serious concern for infants below the age of six months, who can become seriously ill or die, as their inability to process the nitrate deprives them of oxygen (so-called "blue baby" syndrome). Nitrate contamination requires the use of bottled water, as boiling only makes the nitrate more concentrated.

If the required monitoring for coliform and nitrate is not being done for a particular water system, the operator of that water system is required to post or distribute the same public notice as if the water had been tested and found to be contaminated, and to notify the ANR that the public notice has been accomplished. VWSR § 10.3. The purpose of public notice is so that the users of the system do not rely on the general assumption that drinking water supplied to the public is safe to drink.

4

The public notice may be accomplished by posting, by radio, or by hand or direct delivery, as appropriate to the particular water system. VWSR § 10.2.4. A so-called template or form for satisfying the public notice requirement is provided with each notice of alleged violation of the monitoring requirements that is issued by the ANR, as well as a certification form that is required to be returned to the ANR to show that the public notice has been accomplished.

Prior to some time in 2004, the ANR had only been requiring total coliform sampling on an annual basis, even though the regulations had required quarterly monitoring for coliform. Beginning in late 2003 or early 2004, to assist transient non-community water systems in making the transition to quarterly reporting, the ANR's Water Supply Division engaged a contractor to go to the operators of these systems to teach them how to sample and to inform them that sampling would now be required quarterly.

All transient non-community water systems, including Respondent's system, were advised by letter dated December 23, 2004, that the collection and monitoring of routine samples by the Water Supply Division contractor would conclude with the first quarter of 2005, and that thereafter the water systems would be responsible for their own compliance with the total coliform quarterly monitoring, annual nitrate monitoring, and other routine and specifically required follow-up monitoring. Even if, prior to this letter, Respondent had believed that the Department of Health governed the testing of the Restaurant's water supply, it was not reasonable to persist in that belief after receipt of this letter, which explained the program and referred the reader to the telephone numbers of several ANR employees if the reader had any questions.

Respondent was open for business but did not monitor for coliform after the first quarter of 2005, throughout the remainder of 2005, through all quarters in 2006, and

through the first three quarters of 2007.[4]  Respondent sampled as required for coliform beginning in the final quarter of 2007.  The testing of the samples has revealed an absence of coliform contamination.

Respondent failed to perform annual monitoring for nitrate for 2006, but sampled as required for nitrate beginning in 2007.  The testing of the samples has revealed an absence of nitrate contamination.

During the period when Respondent did not comply with the sampling requirements, he also did not post the required public notices regarding the potential dangers of coliform or nitrates and did not send ANR the certification notices regarding posting.  He came into compliance with this requirement shortly after receiving the January 2008 Administrative Order referred to in footnote 1, above.

The cost of water sampling for coliform is approximately $15 per sample.  The cost of water sampling for nitrate is approximately $60 per sample.  Therefore, Respondent's avoided costs for the coliform and nitrate testing were $60 for the nitrate sample for 2006 and $150 for the ten quarters of coliform samples, calculated as three coliform samples in 2005, four coliform samples in 2006, and three coliform samples for the first three quarters of 2007.  The ANR did not present evidence of Respondent's avoided cost of the public notice and certification to the ANR.

In addition to the monitoring required of all transient non-community water systems for coliform bacteria and for nitrate, water systems may be required to do additional testing to determine whether the ground water source for the system is

---

[4]  The ANR submitted into evidence the warning letters sent to Respondent regarding his failure to monitor for coliform bacteria in the second quarter of 2005 and in the first quarter of 2006, as well as the separate Notices of Alleged Violation sent by certified mail to Respondent for failure to monitor for coliform bacteria for each of the second, third, and fourth quarters of 2006, and the first, second, and third quarters of 2007.  The ANR also submitted into evidence the Notice of Alleged Violation sent to Respondent for failure to monitor for nitrate for calendar year 2006.  The ANR resent the July 2007 notice by regular mail after Respondent refused the certified mail copy.

under the direct influence of surface water, sometimes referred to by the acronym "GWUDI." Although generally systems using drilled wells are not required to undertake testing for this reason, this additional testing may be required by the ANR if the monitoring results or other inspection observations suggest that the well may be at risk for contamination by surface water. The additional required testing of such a system is called a microscopic particulate analysis (MPA).

In 2003, the ANR determined that the Restaurant's well was not under the direct influence of surface water and did not require MPA testing. However, coliform monitoring done in 2004 showed a positive coliform test result (indicating the presence of coliform bacteria at that time). The construction details for the well, which would reveal whether the well was properly sealed, were unknown to the ANR. A representative of the Water Supply Division inspected the system on September 20, 2006, and observed that an intermittent stream was located less than 50 feet from the well, and that the area around the well was wet. Respondent was present during that inspection, which had been scheduled during the day at a time that was inconvenient for him in light of the operating hours for the restaurant, but he did not provide additional information about the well's construction.

Based on the inspection, the 2004 coliform test result, and the absence of construction details for the well, the ANR determined that the water system was at risk for being under the influence of surface water. On February 2, 2007, the ANR sent Respondent a written notice requiring him to perform microscopic particulate analysis (MPA) testing between April 1 and June 1 of 2007, so that the ANR could determine whether the system was or was not actually under the influence of surface water.[5]

---

[5] Even if the Court were to consider the weather data and photograph submitted after trial by Respondent to suggest that the wetness near the well was due to rain, it was not unreasonable for the ANR to require the MPA testing, based on the lack of information about the construct of the well and the proximity of the well to surface water. In any

Respondent did not perform the required MPA testing until April of 2009; he had the MPA testing done on April 7, 2009, and submitted the results to the ANR. Based on those submissions, the Water Supply Division determined that Respondent's water source was <u>not</u> under the direct influence of surface water. The ANR did not present evidence of the avoided cost of Respondent's delaying the MPA testing from 2007 to 2009.

The costs of enforcement expended by ANR on this case consisted of approximately thirty hours of one ANR employee's time, at $26 per hour, plus approximately five hours of another employee's time at $22.27 per hour, for a total of $891. The ANR did not present evidence of its attorney's time expended on this case.

<u>Conclusions as to Violation (10 V.S.A. §8012(c)(1))</u>:

The statute requires this Court to determine whether a violation has occurred, 10 V.S.A. § 8012(b)(1), independently of reviewing and determining anew a penalty amount under 10 V.S.A. § 8012(b)(4).

By failing to monitor for coliform during ten consecutive quarterly reporting periods, from the second quarter of 2005 through the third quarter of 2007, Respondent violated VWSR Subchapter 21-6, § 6.6 and 40 C.F.R. § 141.21, which mandate water quality monitoring for coliform bacteria. By failing to perform annual monitoring for nitrate for 2006, Respondent violated VWSR Subchapter 21-6, § 6.8 and 40 C.F.R. § 141.23, which mandate water quality monitoring for nitrate. By failing to perform microscopic particulate analysis during the required April to June period in 2007 or 2008, Respondent violated VWSR Subchapter 21-6, § 6.2.3, which mandates microscopic particulate analysis in order to make a Ground Water Under the Direct Influence of Surface Water determination. By failing to post public notice, and by failing to certify to

event, Respondent did not then challenge the ANR's requirement that he conduct the MPA testing.

the ANR that the posting had been accomplished, Respondent violated VWSR Subchapter 21-10, § 10.1 and 40 C.F.R. § 141, Subpart Q, which govern public notice requirements.

Determination of Order and Penalty (10 V.S.A. §8012(c)(3)):

The Administrative Order contained no remedial provisions to correct any past violations. It did contain directives for future compliance, however, all the directives for future compliance had been achieved as of the date of trial, and none of the directives required continuing compliance in the future.[6] The Administrative order did impose a monetary penalty. Therefore, all that remains is for the Court to determine anew an appropriate penalty amount for the violations by applying the criteria set forth in 10 V.S.A. § 8010(b).

Penalty

The Administrative Order had imposed a penalty of $5150, and the Secretary's post-trial memorandum requested a penalty of $6101. A civil penalty must be basically remedial in effect, rather than primarily punitive. See Town of Hinesburg v. Dunkling, 167 Vt. 514, 524 (1998) ("A civil penalty is remedial in nature, while a criminal penalty is designed for deterrence and retribution." (citing State v. Strong, 158 Vt. 56, 60 (1992))); see also, e.g., Vt. Agency of Natural Res. v. Fern Hill Farm, Ltd., No. 129-8-03 Vtec, slip op. at 13 (Vt. Envtl. Ct. Jan. 20, 2006) (Wright, J.) (stating that "for a civil penalty to withstand constitutional scrutiny it must be basically remedial in effect, rather than

---

[6] Compare Vt. Agency of Natural Res. v. Whitham, No. 29-2-08 Vtec, slip op. at 14–15 (Vt. Envtl. Ct. Mar. 2. 2009) (Wright, J.) (dealing with an administrative order that required the respondent to continue to take required action into the future, e.g., to "continue to conduct" monitoring and to "immediately contact the Water Supply Division" in the event that tests were not completed in a timely manner).

punitive").

The methodology inherent in the statute and applied consistently by this Court in imposing a penalty has been first to remove the economic benefit gained from the violation, in order to carry out the statutory purpose of preventing the unfair economic advantage obtained by persons who operate in violation of environmental laws, 10 V.S.A. § 8001(2) and § 8010(b)(5),[7] and then to apply the remaining statutory factors to determine what additional penalty is needed, or whether any mitigating factors should reduce any element of the penalty. That is, the entire economic benefit first must be removed to carry out a primary purpose of the Uniform Environmental Enforcement Act: to make it less expensive to comply with the law than to violate it.

In addition to the removal of economic benefit as required by § 8010(b)(5), § 8010(b) requires the Court next to consider the following factors in determining the amount of the penalty: (1) actual or potential harm to human health and the environment; (2) the presence of mitigating circumstances, including unreasonable delay on the part of the Secretary in seeking enforcement; (3) whether the Respondent knew or had reason to know the violation existed; (4) Respondent's record of compliance; (6) deterrent effect of the penalty; (7) actual cost of enforcement; and (8) length of time the violation has existed.

Potential for Harm to Human Health, 10 V.S.A. § 8010(b)(1)

Respondent's failure to test the water and failure to warn the system's users of the potential for water contamination did not result in any <u>actual</u> harm to public health. These violations are nevertheless important due to the <u>potential</u> for harm to human

---

[7]  Effective July 1, 2008, the recapture of economic benefit was separated from the § 8010(b) penalty factors, and now may be recaptured in addition to the maximum penalty amount. Compare 10 V.S.A. §§ 8010(c)(1), (2). As some of Respondent's actions for which penalties are sought occurred prior to the date of this statutory change, 1 V.S.A. § 214 requires application of the prior statute; however, it makes no practical difference to the result in this case.

health from untested drinking water, especially if users of a water system are not properly informed of the potential dangers from the untested water.

Mitigating Circumstances, 10 V.S.A. § 8010(b)(2)

Respondent presented some evidence of his medical problems, and of the relatively adverse economic conditions of the Restaurant's operation from August of 2008 through August of 2009. That evidence has been considered in the amount of the total penalty imposed in this case and the amount necessary in this instance to achieve deterrence and obtain compliance.

The financial difficulties of the Restaurant, however, do not excuse compliance with the laws and regulations required to protect the public health any more than a not-for-profit organization such as a museum or a hospital, or a public institution such as a state agency, would be excused from compliance with such regulations in the operation of a café, snack bar, water fountain, or state highway rest area.

No mitigation of the penalty is required due to ANR delay; the ANR sought enforcement for the violations at issue within a reasonable time frame.

Whether Respondent Knew or Had Reason to Know the Violation Existed, 10 V.S.A. § 8010(b)(3)

Towards the end of 2004, Respondent was made aware of the drinking water testing requirements and the expected transition to Respondent's responsibility for carrying out and reporting the required testing beginning in April 2005. As to the posting of notice, based on the attachments to the Notices of Alleged Violation, Respondent had reason to know that he had to post notice and to provide certification of posting to the Water Supply Division of the ANR. It was not reasonable for him to refuse mailed notices or to maintain a belief in inapplicable information on the Vermont Department of Health website, once the notices in early 2005 provided him with information on the applicable ANR rules, and provided the ANR website with links to the applicable rules. Although Respondent testified that he has experienced more

11

effective outreach from other state programs, such as those responsible for taxes and for health inspections, once Respondent was informed of the ANR regulations and given the information necessary to comply with them, it was his responsibility to come into compliance.

Some 700 transient non-community water systems operate in Vermont, most in compliance with these regulations. As a matter of fairness and respect for the many people in Vermont who comply with these regulations, it is necessary to impose a money penalty on those who fail to come into compliance after they have been advised of the requirements of the regulations. See 10 V.S.A. § 8001 (purposes of Uniform Environmental Enforcement Act include to "prevent the unfair economic advantage obtained by persons who operate in violation of environmental laws" and to "provide for more even-handed enforcement of environmental laws," as well as to "foster greater compliance with . . . environmental laws" ).

Respondent's Record of Compliance, Duration of the Violation, 10 V.S.A. § 8010(b)(4),(8)

Respondent took ten quarters, spanning a period of 2½ years, to come into compliance with the coliform testing requirements, one year to come into compliance with the nitrate testing requirements, and two years to come into compliance with the GWUDI testing requirements.[8] Respondent also took 2½ years, from the second quarter of 2005 until the January 2008 Administrative Order, to come into compliance with the posting requirements. In recognition of the effort made by most of the other similar water systems to comply with these regulations, an appropriate penalty must take account of the time it took to obtain Respondent's compliance with these requirements.

---

[8] The duration of the GWUDI testing violation extends from early April of 2007, the earliest that the MPA test could have been done after the February 2007 letter, to April 7, 2009, when it was actually done.

Economic Benefit Gained from the Violation, 10 V.S.A. § 8010(b)(5)

Respondent's economic benefit is represented by the avoided cost of doing the coliform and nitrate testing, for a total of $210. No evidence was presented as to any economic benefit to the Restaurant from the absence of public warning notices about the Restaurant's drinking water.

Deterrent Effect of the Penalty, 10 V.S.A. § 8010(b)(6)

Respondent has come into compliance with the coliform testing requirements, and the nitrate testing requirements, and the system has been determined not to be at risk from the influence of surface water, based on the MPA test results. The Administrative Order does not contain any requirements for future compliance, although Respondent now recognizes his obligation to continue to perform the required quarterly coliform testing and the required annual nitrate testing. Although the penalty must recognize the length of time it took to achieve Respondent's compliance, the penalty imposed in this case should be adequate to achieve deterrence, that is, to achieve future compliance with the requirements.

Actual Cost of Enforcement, 10 V.S.A. § 8010(b)(7)

ANR's actual cost of enforcement, exclusive of attorney time which was not presented in evidence, was approximately thirty hours of one ANR employee's time, at $26 per hour, plus approximately five hours of another employee's time at $22.27 per hour, for a total cost of enforcement of $891.

Taking all of the foregoing factors into account, the imposition of a total penalty of $3500 for the violations is appropriate in the present case. This penalty includes $891 in enforcement costs and $210 in economic benefit (avoided cost of compliance), as well as an additional $2399 in recognition of the potential for harm to human health, the relatively lengthy period of time it took to achieve compliance, the need for future deterrence, and the other factors discussed above.

13

Prospective compliance

Paragraphs B and C of the Administrative Order required Respondent to issue public notice to the system's users for the failure to monitor for coliform and nitrate, and to submit copies of the notices and the related public notice certification forms to the Water Supply Division of the ANR. Respondent complied with Paragraphs B and C in approximately January 2008, and also began the required monitoring for coliform and for nitrate by that time. Paragraphs D and E of the Administrative Order required Respondent to conduct MPA testing during the period between April 1, 2009, and June 1, 2009, and to submit the results to the Water Supply Division of the ANR by July 1, 2009. Respondent complied with paragraphs D and E as of April 7, 2009, so that the system was ruled to be exempt from further requirements regarding GWUDI. No further prospective compliance is required by the Administrative Order.

Accordingly, taking all these factors into account, and based on the findings, conclusions, and reasoning of this decision, it is hereby ORDERED and ADJUDGED that:

Paragraph A of the August 20, 2008 Administrative Order is vacated. On or before June 8, 2010, Respondent shall pay a total penalty of $3500 for the violations, to the State of Vermont, to be deposited in the general fund pursuant to 10 V.S.A. §8010(e). Respondent and the ANR may discuss a payment schedule and propose it to the Court as a modification of this order.

Paragraphs B, C, D, and E of the Administrative Order have been complied with and do not require any prospective order. They are therefore affirmed, with the recognition that Respondent has come into compliance with them and no prospective order is required, other than to note that Respondent continues to be responsible for future compliance of the water system with the regulations applicable to it.

14

<u>Rights of Appeal (10 V.S.A. §§ 8012(c)(4) and (5)):</u>

WARNING: This decision will become final if no appeal is requested within ten (10) days of receipt of this decision. Respondent and the Secretary of the Agency of Natural Resources have a right to appeal this decision. The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.), subject to the Vermont Rules for Environmental Court Proceedings (V.R.E.C.P.) 4(d)(6). Within ten (10) days of receipt of this Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of this Court, together with the applicable filing fee. Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276. An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court. 10 V.S.A. § 8013(d). A party may petition the Supreme Court for a stay under the provisions of Vermont Rule of Civil Procedure (V.R.C.P.) 62 and V.R.A.P. 8.

Done at Berlin, Vermont, this 8th day of March, 2010.

_____
Merideth Wright
Environmental Judge